RECEIVED
IN LAKE CHARLES, LA

FEB 16 2006

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### LAKE CHARLES DIVISION

| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION | : | DOCKET NO. 04 CV 2419 |
|---|---|---|
| VS. | : | JUDGE MINALDI |
| NOBLE (U.S.) INC. | : | MAGISTRATE JUDGE WILSON |

## **MEMORANDUM RULING**

This matter is before the Court on the Plaintiff's Motion for Partial Summary Judgment [Doc. # 28] filed on September 6, 2005 and the Defendant's Motion for Summary Judgment [Doc. #31] filed on September 7, 2005. This action was filed by the EQUAL EMPLOYMENT OPPORTUNITY COMMISSION ("EEOC"), for claims arising under Title VII of the 1964 Civil Rights Act ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.* The EEOC filed this action on behalf of Robert T. Minter ("Minter") alleging that Minter, a black male, was subjected to a racially hostile work environment by the Defendant, NOBLE (U.S.) INC., ("Noble") and was discharged for complaining of racial harassment. Specifically, the EEOC alleges that Minter had a noose tied around his neck by three white co-workers during his work assignment and that Noble terminated his employment in retaliation for reporting the incident. Noble submits that because (1) it took prompt remedial action after being notified of the alleged harassment, and (2) it terminated Minter's employment for a legitimate, non discriminatory reason, no basis for the EEOC's claims exist and summary judgment should be granted in its favor.

**Background**

Noble is an offshore drilling contractor. Noble owns and operates approximately 63 oil rigs stationed around the world. Aboard these rigs are approximately 25 to 30 crew members, whose jobs range from the entry level "roustabouts" to the Offshore Installation Manager ("OIM"). Also aboard the rigs are various contractors, such as caterers, cementers, and remote operated vehicle employees. Overall, Noble employs approximately 3,500 employees.

Minter began his drilling career with Noble in May of 2001 as an entry level "roustabout 1" aboard one of Noble's semi-submersible oil rigs called the *Noble Homer Ferrington*.[1] As an offshore employee, Minter worked a 14 day "hitch," broken down into 12 hour days, each known as a tour. Upon the completion of a hitch, he and the rest of his crew would return to shore and report for work 14 days later. Prior to the incident that is the subject of this suit, Minter had no performance problems or other disciplinary issues.

On June 20, 2003, Minter and roustabouts Brian Dupre ("Dupre"), Shelton Richardson ("Richardson") and Gregory Gwin ("Gwin"), all white, were instructed by their supervisor, Crane Operator Frank Guillory ("Guillory"), to clean and organize the number one column at the bow of the rig while a thunderstorm was passing through outside. Upon discovering that this task already had been done, Guillory told them to wait until he called on them for the next project. As they waited, Minter fell asleep during which time the three white roustabouts placed a noose around his neck and suspended the other end around an overhead pipe. Richardson, balanced himself on an overhead beam above Minter, so that when Minter awoke he claims that he

---

[1] The type of work roustabouts were asked to perform aboard the rig varied from heavy labor, including offloading boats and stacking pipe to tasks that were not as physical, such as watching mudflow and drill cuttings flow through the "gumbo box" for 12 straight hours.

2

believed that he was going to be lynched.

Following his shift, Minter alleges that he reported the incident to both his first and second level supervisors, Guillory and Mike Malveaux, but claims that no satisfactory action was taken.[2] Allegedly concerned that his immediate supervisors had not taken action, Minter decided to tape-record his next complaint to third-level supervisor, Rig Manager P.J. Hammond. Hammond tried to console Minter, suggested that it was just a joke, agreed that it was inappropriate, and assured him that he would handle the matter the following morning.[3] Thereafter, Hammond brought the incident to the attention of OIM, Gary Gilmer ("Gilmer") who, in turn, contacted corporate headquarters. Following that discussion, on the morning of June 21, 2003, Gilmer issued the following written warning to the three white roustabouts:

> Horseplay while on Noble property is a direct violation of Noble policy. This action will not be tolerated. This will serve as the last warning in regards to violation of policy.[4]

That same morning, Minter received the following written warning:

> Sleeping while on tour is a direct violation of Noble policy. This action will not be

---

[2] PX 3, *Deposition of Robert T. Minter* ("Minter Dep."), p. 95, l. 5-15; PX 4 *Affidavit of Robert T. Minter* ("Minter Aff."). Minter alleges that upon hearing of the incident Guillory suggested that the white roustabouts didn't mean anything by their actions. Still upset, Minter alleges that he approached his second-level supervisor, Barge Engineer Mike Malveaux, also a black male who allegedly told Minter that he knew of other racial situations and remarked that this is why he didn't joke with white employees. *Id.* Minter alleges that Malveuax then told him to think long and hard about where he wanted to go with this incident and that he had to prepare himself for what would happen if he continued to take this incident up the chain of command. *Id.*

[3] PX 4, Minter Aff. ¶ 8.

[4] PX 7-9, Employee Discipline for Bryan Dupre; Employee Discipline for Gregory Gwin; Employee Discipline for Shelton Richardson.

3

tolerated. This will serve as the last warning in regards to violation of policy.[5]

Minter was further ordered to "familiarize himself with company policy," although no prohibition against sleeping on the job was included in Noble's 61 page Safety Handbook at the time of this incident. A few hours after receiving the write-ups, all four roustabouts convened with Gary Gilmer and were told that a crew boat was coming to return them to shore and that they were being terminated. For the remainder of the work day the four were confined to their quarters, and in the early evening they boarded a boat for the six-hour ride back to shore. Minter alleges that he was petrified throughout his ride back to shore because the white roustabouts were on the crew boat with him. Minter alleges that he feared that the white roustabouts would hold him responsible for the loss of their jobs. He alleges that he remained awake and fearful the entire night. In the middle of the night, on June 22, 2003, the boat carrying the terminated roustabouts arrived at Cameron, Louisiana without incident. From Cameron, Minter arranged for transportation back to his home in Virginia.

## Summary Judgment Standard

Summary judgment is appropriate when the movant is able to demonstrate that the pleadings, affidavits, and other evidence available to the Court establish that there are no genuine issues of material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56(c); See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25, 106 S.Ct. 2548, 2552-54, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); and *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-88, 106 S.Ct. 1348, 1355-57, 89 L.Ed.2d 538 (1986). When the

---

[5] PX 10, Employee Discipline dated 6/21/03,

nonmoving party has the burden of proof on an issue, the movant must state the basis for the motion and identify those portions of the pleadings, depositions, admissions, answers to interrogatories, together with affidavits, that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553; *Topalian v. Ehrman*, 954 F.2d 1125, 1131-32 (5th Cir.1992), cert. denied, 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). A mere conclusory statement that the other side has no evidence is not enough to satisfy a movant's burden. See *Celotex*, 477 U.S. at 328, 106 S.Ct. at 2555.

Once the movant has shown the absence of material factual issues, the opposing party has a duty to respond, via affidavits or other means, asserting specific facts demonstrating that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Anderson*, 477 U.S. at 256, 106 S.Ct. at 2514; *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. The Court must view the evidence introduced and all factual inferences from the evidence in the light most favorable to the party opposing summary judgment. *Eastman Kodak v. Image Technical Services*, 504 U.S. 451, 456-58, 112 S.Ct. 2072, 2077, 119 L.Ed.2d 265 (1992); *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356. However, a party opposing summary judgment may not rest on mere conclusory allegations or denials in his pleadings. Fed.R.Civ.P. 56(e); see also *Topalian*, 954 F.2d at 1131.

## Law and Analysis

Title VII prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).[6]

---

[6] The EEOC's "retaliation" charge is covered by Section 704 which prohibits discrimination against any employee, "because he has opposed any practice made an unlawful employment practice or because he has made a charge, testified, assisted, or participated in any

5

*Plaintiff's Hostile Work Environment Claim*

A Title VII violation may be established by proving that discrimination based upon race has created a hostile or abusive working environment. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 66 (1986). A prima facie case of racial harassment alleging hostile work environment normally consists of five elements: (1) the employee belongs to a protected group; (2) the employee was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment complained of was so severe or pervasive that it affected a term, condition or privilege of employment; (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action. *Celestine v. Petroleos de Venezuella,* SA 266 F.3d 343, 353 (C.A.5 (La.),2001) (citing *Watts v. Kroger Co.,* 170 F.3d 505, 509-10 (5th Cir.1999)).

Under a "continuing violation theory," the EEOC asserts that in confining Minter for six hours on a boat with those who tied the noose around his neck, Noble maintained the existence of the hostile work environment originally created by the roustabouts responsible for the noose incident.[7] For racial harassment to be actionable as a hostile work environment claim it must be "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment."*Meritor Savings Bank v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). *Ramsey v. Henderson,* 286 F.3d 264, 268 (C.A.5 (La.),2002). Determination

---

manner in an investigation, proceeding, or hearing under this subchapter 42 U.S.C.A. § 2000e-3.

[7] In the context of a hostile work environment claim, a "continuing violation" is a series of separate acts that collectively constitute one "unlawful employment practice." *National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 117, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).

of whether an environment is offensive or abusive requires an *ad hoc* analysis, "focusing on factors such as the frequency of the conduct, the severity of the conduct, the degree to which the conduct is physically threatening or humiliating, and the degree to which the conduct unreasonably interferes with an employee's work performance."*Amie v. City of Jennings, Louisiana*, 2005 WL 1788068, 1 (W.D.La.,2005) (citing *Green v. Administrators of Tulane Educational Fund*, 284 F.3d 642, 655 (5th Cir (La) March 15, 2002)). Simple teasing, offhand comments and isolated incidents (unless extremely serious) rarely will be enough to sustain a hostile work environment claim. *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 2283 (1998). To establish that harassing conduct was severe or pervasive, an employee must meet both a subjective and objective test. *See Harris v. Forklift Systems, Inc.* 510 U.S. 17, 21, 114 S.Ct. 367, 370 (U.S.,1993).

Although the EEOC perhaps has offered evidence sufficient to create a genuine issue of material fact that the noose incident was both objectively and subjectively severe, the mere presence of Minter's alleged harassers on the same crew boat does not rise to the level of an actionable hostile work environment.[8] First, although the EEOC claims that the boat ride was

---

[8] In his own deposition Minter states that his reaction to the noose incident was one of shock; that he considered it to be a near death experience and he couldn't help but replay the incident over in his head. *See Minter Dep.*, p. 93-94. Within a few days, he began treatment and medication for post traumatic stress disorder and continues his treatment and medication today. *Statement of Michele Baldwin*, Plaintiff's Exhibit 4 attachment 1; *Minter Dep.*, p. 5, 46-49. *See also Harris v. Forklift Systems*, Inc. 510 U.S. 17, 114 S.Ct. 367, (U.S.,1993) (Psychological harm, like any other relevant factor, may be taken into account in the court's determination of whether or not the environment would reasonably be perceived, and is perceived, as hostile or abusive). Thus the record indicates some evidence of Minter's subjective belief that the conduct was severe and pervasive. Further in the present case, the combination of physical contact, Minter's race and the powerful racist symbolism of a noose could be enough to elevate this incident to the level of objectively severe harassment. But the court need not reach a conclusion. Noble took prompt remedial action to address the harassment.

7

subjectively severe and pervasive, Minter admits that the boat ride was uneventful, recounting that he talked to his former colleagues during the trip and that "everything was casual." *See Minter Dep.* at 119. Noble's safety training supervisor, who had accompanied an ill worker on the boat, also confirmed that the trip proceeded without incident and that the four former roustabouts shook hands and said goodbye in a "jovial" manner upon reaching shore. *See Deposition of Ralph Benoit* at 11, 50-56, 65-71. More importantly, conduct is only actionable under a hostile work environment theory if it altered the terms or conditions of employment. *See Harris v. Forklift Systems*, Inc. 510 U.S. 17, 114 S.Ct. 367, (U.S.,1993). Because Minter had been terminated by the time the boat trip took place, there were no terms or conditions of employment to alter.[9]

Because the boat ride does not amount to actionable conduct on the part of Noble, the EEOC's *supervisor*-created hostile work environment claim fails.[10] Thus, the burden of proof remains with the EEOC to show that Noble failed to take prompt remedial action to address Minter's complaints of harassment.

When a company, once informed of allegations of sexual harassment, takes prompt

---

[9] *See Andrews v. Atlantic Marine, Inc.*, 2005 WL 2665345, 3 (S.D.Ala.,2005) (The employee's work environment with defendants ended upon his termination. Although his subsequent meeting with human resources may have been related to his termination or to his request for rehire, that fact would not continue or resurrect his alleged discriminatory termination or hostile work environment.).

[10] In supervisor-created hostile work environment claims, the employer must assert the *Faragher/Ellerth* affirmative defense and bear the burden of proving that (i) it exercised reasonable care to prevent and correct promptly and harassing conduct, and (ii) the harassed employee unreasonably failed to take advantage of any preventative opportunities provided by the employer. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Industries, inc. v. Ellerth*, 524 U.S. 742, 765 (1998).

remedial action to protect the claimant, the company may avoid Title VII liability. *See Jones v. Flagship Int'l*, 793 F. 2d 714, 719 (5th Cir. 1986). Prompt remedial action must be "reasonably calculated to end the harassment." *Hockman v. Westward Communications, LLC*, 407 F.3d 317, 329 (C.A.5 (Tex.),2004) (citations omitted). The EEOC cites cases which hold that an employer cannot avoid Title VII liability for a hostile work environment by either immediately terminating the complaining employee or taking remedial action that leaves the plaintiff worse off because doing so creates an issue as to whether the employer's response was in fact reasonably calculated to halt the harassment or instead was an act of retaliatory discharge.[11] The facts of those cases, however, differ materially in that either (1) the *only* remedial action taken was to terminate the complaining employees or (2) the employees had not committed their own, unrelated work rule violations. Noble's termination of the three white roustabouts within hours of Minter's complaint indisputably constitutes prompt remedial action as a matter of law.[12] Whether or not it was justified in taking action against Minter is immaterial to the hostile work environment claim and is more appropriately analyzed under the EEOC's retaliation claim.

*Retaliation*

Fifth Circuit jurisprudence requires an employee to prove three elements to carry a

---

[11] *See Goff v. Soundolier Div. of American Trading & Production Corp.* 2000 WL 707810, 5 (N.D.Tex.,2000); *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1049 (7th Cir. 2000).

[12] *See, e.g. Hockman*, 407 F. 3d at 329 ("When a company, once informed of allegations of...harassment, takes prompt remedial action to protect the claimant, the company may avoid Title VII liability."); *Waymire v. Harris County, Tex.*, 86 F. 3d 424, 429 (5th Cir. 1987) (investigation was sufficiently prompt despite lasting three months where supervisor reprimanded alleged harasser on the day of the complaint and filed a preliminary report with his superior within one week).

retaliation claim: (1) that he has engaged in activity protected by Title VII; (2) that the employer took adverse employment action against him; and (3) that a causal connection exists between the protected activity and the adverse employment action. Retaliation claims are subject to the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S 792 (1973), *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), and *St. Mary's Honor Center v. Hicks*, 509 U .S 502 (1993). Accordingly, upon the establishment of a *prima facie* showing of retaliation, the burden then shifts to the defendant to produce a legitimate, nondiscriminatory reason for the adverse employment action. *Sherrod v. American Airlines, Inc.*, 132 F 3d 1112, 1122 (5 th Cir.1998). This burden on the employer is one of production, not persuasion, involving no credibility assessments. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255-56, 101 S.Ct. 1089 (1981). If the defendant meets this burden, then the mandatory inference of discrimination created by the plaintiff's *prima facie* case ceases and the plaintiff must adduce sufficient evidence that the defendant's proffered reason is a pretext for retaliation. *Price v. Marathon Cheese Corp.*, 119 F.3d 337 (5th Cir. 1997). At all times, the ultimate issue in a retaliation case remains whether the protected conduct was a "but for" cause of the adverse employment decision. *Long v. Eastfield College*, 88 F.3d 300, 305 n 4 (5th Cir.1996). Even if the employee's conduct is a "substantial element" in the employer's decision to terminate an employee, the employer escapes liability if it would have taken the same action irrespective of the protected activity. *Id.*

For the purpose of establishing a *prima facie* case, the close temporal proximity between a plaintiff's discharge and his protected activity serves as indirect proof of a causal connection. *Armstrong v. City of Dallas*, 997 F.2d 62, 67 (C.A.5 (Tex.),1993). Consequently, the EEOC has established a *prima facie* case by showing that Minter was fired within hours of complaining of

10

alleged racial harassment. Nevertheless, Noble claims to have discharged Minter because he admitted to violating a company safety rule: sleeping while on duty. Title VII's protection does not insulate an employee from discipline for work rule violations. *See Swanson v. General Services Admin.*, 110 F.3d 1180, 1188 n.3 (5th Cir. 1997). Accordingly, Noble has met its burden and the EEOC must now demonstrate that Noble's proffered reason was actually a pretext for a retaliatory motive.

The EEOC asserts that a work-rule violation could not have been the true reason for Noble's termination of Minter because (A) no rule prohibiting sleeping on the job was included in Noble's 61 page Safety Handbook at the time of this incident and (B) even if such a rule existed, prior to Minter's termination Noble did not make a practice of terminating employees for falling asleep on the job.

The fact that Noble's rule prohibiting sleeping on the job was unwritten does not render it "nonexistent" as the EEOC's suggests. *See e.g. Stein v. National City Bank*, 942 F.2d 1062, 1065 (C.A.6 (Ohio),1991) ("Whether a policy is written or unwritten has minimal probative value on the issue of pretext").[13] Noble claims that it communicated the rule orally to its employees during safety meetings and in fact each of Noble's managers deposed in this suit testified to its existence.[14] Even the supporting evidence submitted by the EEOC documents the fact that numerous employees were reprimanded and at least one employee had been terminated in the

---

[13] *See also Williams v. Alabama Indus. Dev't Tr'g*, 146 F.Supp.2d 1214, *1226 (M.D.Ala.,2001) ("...Congress does not force employers to amass an encyclopedic collection of rules that are known throughout the shop. When an employee... understands the general thrust of an unwritten work rule, decisions based on the rule are not pretextual absent concrete evidence that the rule was used as a mask for retaliation.").

[14] See *Puckett Dep.* at 56; *Hammond Dep.* at 31; *Martin Dep.* at 90; *Guillory Dep.* at 86; *Malveaux Dep.* at 70.

past for falling asleep on the job.

Regardless of whether or not the rule actually existed, however, a Title VII plaintiff may establish pretext by showing that employees not in the protected class engaged in similar acts but were not similarly disciplined. *See Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir.1995); *Wallace v. Methodist Hosp. System*, 271 F.3d 212, 220 (C.A.5 (Tex.),2001) (*quotations and citations omitted*) (a plaintiff may establish pretext through evidence of disparate treatment). The EEOC has provided evidence of several instances in which roustabouts aboard the *Noble Homer Ferrington* were caught sleeping during their shifts but were not terminated. Minter himself, alleges that he had been caught sleeping on the job, that he simply was told to get back to work, and that he did not receive a formal written warning. *See PX 3, Minter dep.*, p.107, l.20-25, p. 108, l. 1-9. Roustabout Gwin, one of the roustabouts terminated as a result of the noose incident, had received multiple "write-ups" for sleeping on the job but was never terminated as a result. *See PX 18, Employee Discipline for Gwin (sleeping); PX 5, Hammond dep.*, p. 33, l. 13-25, pp. 34-36. Likewise, former roustabouts Colby Jarrell and Darren Pittman claim not only that they were caught sleeping aboard the *Noble Homer Ferrington* on numerous occasions, but that they witnessed several other Noble employees get caught as well. With the exception of one employee who climbed to the perch of a crane and fell asleep in a particularly dangerous position, none of these employees was terminated.

There is an important distinction between Noble's treatment of Minter and that of the other employees caught sleeping on the job in that their disciplinary decisions were handed down by different decision-makers. To establish discriminatory intent by disparate treatment, a plaintiff must show that the employer gave preferential treatment to an employee outside the protected

12

class in circumstances "nearly identical" to the plaintiff.[15] Courts within the Fifth Circuit have frequently held that where different decision-makers are involved, the circumstances are not "nearly identical."[16]

Although the EEOC concedes it cannot satisfy the "nearly identical" requirement, it argues that the involvement of Jimmy Puckett, Noble's Gulf Coast Division Manager, in Minter's disciplinary decision marks a "sharp... deviation in protocol" which supports an inference of retaliation. *See Plaintiff's Resp. Mem.* at 5-6. This argument is without merit. Puckett learned about Minter's sleeping on duty because OIM Gary Gilmer properly recognized the seriousness of Minter's allegations of racial harassment and reported the incident to upper management. Under these circumstances, the fact that Puckett ultimately made the disciplinary decisions involved in this incident reflects the gravity accorded this incident by management not a departure from procedure which evidences pretext. In investigating Minter's complaint, Puckett learned that Minter had admitted to violating the safety rule against sleeping on duty and he imposed the same discipline as he had on all employees whom he learned had slept on duty.[17] Because the EEOC does not identify a situation where Puckett did not discharge an employee for

---

[15] *See e.g. Edwards v. Grand Casinos of Mississippi, Inc.* 145 Fed.Appx. 946, 2005 WL 2000667 (C.A.5 (Miss. (C.A.5 (Miss.),2005); *Keelan v. Majesco Software, Inc.* 407 F.3d 332, 345 (C.A.5 (Tex.),2005); *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 406 (5th Cir. 2005); *Okoye v. University of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512-13 (5th Cir. 2001); *Urbano v. Continental Airlines, Inc.*, 138 F.3d 204, 206 (5th Cir), *cert. denied*, 525 U.S. 1000 (1998).

[16] *See e.g. Wyvill v. United Cos. Life Ins. Co.*, 212 F.3d 296, 304 (5th Cir.2000) (involving ADEA claims); *Burnett v. Thompson*, 31 Fed. Appx. 839, 839 (5th Cir. 2002) (*per curiam*); *Little v. Repubic Refin. Co.*, 924 F.2d 93, 97 (5th Cir. 1991).

[17] *See Puckett Decl.* ¶8 (Def.' MSJ App. 2); Puckett Dep. at 63-65 (Prior to June 20, 2003, Puckett had no knowledge of any employee caught sleeping on the job, who was not terminated).

falling asleep, the EEOC has not raised a genuine issue of material fact in its retaliation claim.[18]

Therefore, for the reasons stated herein, the EEOC's Partial Motion for Summary Judgment [doc. #28] is DENIED and Noble's Motion for Summary Judgment [doc. #31] is GRANTED.

Lake Charles, Louisiana, this 16 day of February, 2006.

PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE

---

[18] Although, the EEOC advances additional arguments, they are likewise insufficient to establish retaliatory motive. First, even though the EEOC may use the close temporal proximity between Minter's complaint of harassment and his termination to establish its *prima facie* case, timing alone does not establish that the former was the "but for" cause of the latter. *See Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 (5th Cir. 1999). "If timing alone were enough, then any action taken against [an employee following a protected activity], no matter how justified, could be sustained as discriminatory." *Swanson*, 110 F.3d at 1188 n.3; *Accord Kolpakchi v. Principi*, 113 Fed. Appx. 633, 639 (5th Cir. 2004); *Juarez-Keith v. U.S. Foodservice, inc.*, 2005 WL 548074, at 8 (N.D. Tex. Mar. 8, 2005). Minter's complaint was followed closely by his termination because his complaint included an admission to falling asleep on the job. The temporal proximity between the two does not detract from Puckett's assertion that he terminated Minter for violating Noble's prohibition against sleeping on the job.

Second, in quoting §4.13 of Noble's Administrative Policy Manual, the EEOC omits the language that "...in certain circumstances, [Noble] may find it necessary to impose immediate disciplinary action, including termination, without prior notice or counseling." Consequently, Puckett's actions did not conflict with Noble's written policy. Even if Puckett had deviated from policy, Fifth Circuit jurisprudence is clear that noncompliance with personnel policies is not evidence of discrimination. "[]Title VII does not protect employees from arbitrary employment practices, only their discriminatory intent." *Upshaw v. Dallas Heart Group*, 961 F.Supp. 997, 1002 (N.D. Tex. 1997).

14